COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





JOHNNY LEWIS BROWN,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee. 

§


 


§


 


§


 


§


 


§



§

No. 08-06-00162-CR



Appeal from


 291st District Court


of Dallas County, Texas


(TC # F-0572756-NU)




O P I N I O N



 Johnny Lewis Brown appeals his conviction of capital murder. The jury sentenced Appellant
to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice.  We
affirm.

FACTUAL SUMMARY


 During the early morning hours of May 29, 2005, Karston Watson was murdered in his home. 
Chris Taylor was Watson's roommate. (1) Taylor and Watson sold marijuana and PCP or "juice" from
their home on Peru Street. The men would keep a small amount of drugs and sell only to people they
knew. The home was equipped with a camera system which would allow the men to see who was
at the door, but the camera was not set up to record. According to Taylor, Appellant had been to his
home on several occasions.

 Taylor had gone out to a party between 9:30 and 10:30 on Saturday, May 28.  At the time,
Watson was at home with two friends. Taylor remained at the party until 3 a.m. While on his way
home, Taylor was informed by a friend that there were a lot of police officers at his house. 
Suspecting the police had raided his home for drugs, Taylor headed to his friend Andy's home. 
Around 5 a.m., Andy and Taylor drove by the house and saw that the front door was wide open and
the house was ransacked. Later that morning, Taylor called Watson on his cell phone but a police
detective answered the phone instead. The officer told him that Watson had been shot. 

 Around 1:50 a.m. on Sunday, May 29, Justin Foster was waiting for his friends outside a pool
hall near Taylor and Watson's home. He saw a blue car with three occupants pull up to the house. 
He identified Appellant as the front passenger and Appellant's little brother, Damien, as the driver. 
He could not identify the back seat passenger since he was wearing a hoodie. Foster recognized
Appellant because he had dated Foster's aunt, Ella Mae Foster. Foster also recognized Damien
because he had seen him before. Foster watched as Appellant and the back seat passenger exited the
vehicle. The men walked up to the door, knocked, and entered. Foster then heard a gun shot. He
estimated the men were inside for about ten minutes. Foster then saw Appellant exit the house and
noticed he had something in the front pouch of his coat. 

 Charles Ray Johnson testified that he was the passenger who entered the home with
Appellant. Johnson was living with Melinda Foster, Justin's mother, in a home on Claude Street. 
Melinda's sister was Ella Mae Foster, whose nickname was Mae Mae. Appellant would come over
to the house to visit Ella Mae. A few weeks prior to the murder, Appellant and Damien went over
to Johnson's house. Appellant told Johnson that he wanted to "hit that house," meaning he wanted
to rob the new dope house.

 On the night of the crime, Appellant and Damien gathered at Johnson's house. Johnson
wanted to buy some marijuana, so the three men went to the drug house on Peru. Johnson had been
to the drug house with Appellant before. Damien was driving, and Johnson and Appellant got out
of the car. "Trouble" answered the door and then Appellant shot him. Johnson did not know
Appellant had a gun.

 After Watson was shot, Appellant told Johnson to check the bedroom. Johnson searched the
bedroom for drugs and found some marijuana. He went back to the front door, handed Appellant
the drugs, and saw Appellant take a vial of juice and money out of Watson's pockets. Johnson left
the house and took off running. He did not see Appellant again.

 Damien testified he was the driver. A few weeks before the murder, Johnson told Appellant
there was a new dope house on Peru. Appellant told Johnson to check it out. Appellant asked
Damien if he was "going to go hit the lick with [him]," which meant he intended to rob the house. 
Damien said no. On the night of the murder, Appellant picked up Damien and they went to Ella
Mae's house to get high. After an hour or so, the men left to get more "juice." Once at the drug
house, Appellant and Johnson got out of the car and Damien drove about four houses down. He saw
Appellant and Johnson come out of the house and they told him to drive off. He headed back to
Claude Street. Appellant and Johnson walked back to Claude Street and Appellant told Damien "he
had to do the fool . . . the fool got to tripping." Damien also testified that Appellant carried a black
handgun that was like a "nine."

 The only identifiable finger prints acquired from the crime scene belonged to Taylor, who
lived in the home. Police found an unfired round beneath Watson and a fired casing in the living
room. A firearm and toolmark examiner from the Southwest Institute of Forensic Sciences examined
the fired bullet, a nine millimeter unfired cartridge, and a nine millimeter fired cartridge case. 
Although police did not recover the gun, the firearm examiner determined the unfired cartridge and
the fired cartridge had been chambered in the same gun based on their markings. 

 Appellant was arrested in Denton on June 28, 2005, at the home of his girlfriend, Nathania,
who at the time of trial was Appellant's wife. At the Dallas County Jail holding cell, Jerry
Middleton waited in line while Appellant used the telephone. Middleton heard Appellant make two
calls. In the first call, Appellant said, "Hey, I got locked up. That bitch Mae Mae turned me into the
cops for robbing and kicking in doors over there and for shooting that nigger Karlton." There was
a slight pause and then Appellant stated, "Yeah, I shot that nigger." The second call began the same
way: "Hey, I'm locked up. That bitch Mae Mae turned me in for shooting that nigger Karlton." He
then added, "It was on Memorial Day weekend. I said I was in Denton because it was the Memorial
Day weekend. That's where I told them I was. That's where I told the laws I was." 

 Damien testified he received a call from Appellant while he was in jail. Appellant said that
he had been locked up for killing "Karlton Watson" and that Mae Mae had told on him. (2) Damien
told Appellant he didn't want anything to do with it and hung up. 

 Nathania testified that on May 22, 2005, she drove to Dallas with her nephew, Todderick
Castle, and his girlfriend, Sarah Cole, to pick up Appellant. They headed back to Denton where
Appellant lived with Nathania, Castle, Cole, Judy Bell, and Jimmie Gray. On Saturday, May 28,
Nathania stayed home with Appellant. The following day, the group had a barbeque at the house. 
Nathania, Appellant, Bell and Gray were there. Castle and Cole were in and out the house. 
J.W. Lewis, Nathania's neighbor, took Appellant to the store for some lighter fluid.

 Nathania drafted statements for Bell, Gray, Castle, Cole, and her mother Barbara Howard that
contained blanks to fill in their names and signatures. The statements were read by each person and
were signed in front of a notary. 

 I, [witness] will testify that Johnny Brown was in Denton, Texas on May 29, 2005
and before that day until he was arrested. I was with him at 401 Simmons Street,
Denton, Texas on that day. He came to Denton on May 22, 2005 at his house where
he was living. 


Although Howard read and signed the statement, she was not present at Nathania's house on May 29. 
But she had talked to Nathania and Appellant and knew he had been in Denton. 

SUFFICIENCY OF THE EVIDENCE


 Capital murder arises when a person intentionally commits murder in the course of
committing or attempting to commit a robbery. See Tex.Penal Code Ann. § 19.03 (a)(2)(Vernon
Supp. 2006). A person commits robbery if while in the course of committing theft and with intent
to obtain or maintain control of the property he (1) intentionally, knowingly or recklessly causes
bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of
imminent bodily injury or death. See Tex.Penal Code Ann. § 29.02 (a)(Vernon 2003).

 In his first issue, Appellant contends the evidence is legally insufficient to support his
conviction. In reviewing the legal sufficiency of the evidence, we must consider all of the evidence
in the light most favorable to the verdict and determine whether a reasonable juror could have found
the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Hooper v. State, 214 S.W.3d 9, 13
(Tex.Crim.App. 2007). We must give deference to "the responsibility of the trier of fact to fairly
resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts." Hooper, 214 S.W.3d at 13, citing Jackson, 443 U.S. at 318-19. 

 Appellant argues in his second issue that the evidence is factually insufficient to support his
conviction. In a factual sufficiency review, the evidence in reviewed in a neutral light. Roberts v.
State, 220 S.W.3d 521, 524 (Tex.Crim.App. 2007). There are two ways evidence may be factually
insufficient: (1) when the evidence supporting the verdict is so weak that the verdict seems clearly
wrong and manifestly unjust, and (2) when the supporting evidence is outweighed by the great
weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and
manifestly unjust. Id. We cannot conclude a conviction is "clearly wrong" or "manifestly unjust"
simply because, on the quantum of evidence admitted, we would have voted to acquit had we been
on the jury. Watson v. State, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). Nor can we declare that
a conflict in evidence justifies a new trial because we disagree with the jury's resolution of that
conflict. Id. Rather, this Court must first be able to say, with some objective basis in the record, that
the great weight and preponderance of the evidence contradicts the jury's verdict before we can order
a new trial. Id. 

 In conducting a factual sufficiency review, our review should not substantially intrude upon
the fact finder's role as the sole judge of the weight and credibility given to the witness testimony.
Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); see also Marshall v. State, 210 S.W.3d 618,
625 (Tex.Crim.App. 2006)(factual sufficiency review still requires an appellate court to give "due
deference" to the jury's determinations). Both legal and factual sufficiency standards require that
we review all of the evidence. Marshall, 210 S.W.3d at 625. 

 The evidence established Appellant was with Damien and Johnson during the early morning
hours on May 29, 2005. The trio went to the home of Watson and Taylor to get more drugs. Foster
saw Appellant arrive at the scene. Appellant and Johnson entered the home and within a short while,
a gun shot was heard. Johnson saw Appellant shoot Watson. Appellant later told Damien he had
to shoot him because Watson was tripping. Appellant had previously mentioned his interest in
robbing the drug house on Peru. Appellant was overheard admitting that, "Yeah, I shot that nigger." 
He was also heard to say that he told the police he was in Denton over the Memorial Day weekend. 
His alibi witnesses testified to that effect. Viewed in the light most favorable to the verdict, the
evidence was legally sufficient.

 The evidence was also factually sufficient. While Appellant introduced conflicting testimony
as to his whereabouts during the Memorial Day weekend, we must give due deference to the jury's
determinations. We will not substantially intrude upon the jury's role as the sole judge of the weight
and credibility given to the witness testimony. Marshall, 210 S.W.3d at 625; Johnson, 23 S.W.3d
at 7. Because the evidence is both legally and factually sufficient, we overrule Issues One and Two. 

ACCOMPLICE WITNESS


 Appellant contends in his third issue that there was insufficient corroborating evidence to
connect him to the burglary. "A conviction cannot be had upon the testimony of an
accomplice unless corroborated by other evidence tending to connect the defendant with the offense
committed . . . ." Tex.Code Crim.Proc.Ann. art. 38.14 (Vernon 2005). Corroboration is not
sufficient if it merely shows the commission of the offense. Id. An accomplice is someone who
participates with the defendant before, during or after the commission of a crime and also acts with
the required culpable mental state. Druery v. State, 225 S.W.3d 491, 498 (Tex.Crim.App. 2007). 
Under the accomplice witness rule, we must eliminate all of the accomplice testimony and examine
the remaining portions of the record to see if there is any evidence that tends to connect the accused
with the commission of the crime. Castillo v. State, 221 S.W.3d 689, 691 (Tex.Crim.App. 2007). 
The corroborating evidence need not -- by itself -- establish guilt. Id. 

 Appellant argues the evidence was insufficient to support his conviction without the
testimony of the accomplice witnesses, Damien and Johnson. We disagree. First, Middleton
testified he overheard Appellant's telephone conversation: 

 That bitch Mae Mae turned me into the cops for robbing and kicking in doors over
there and for shooting that nigger Karlton.


. . .



 Yeah, I shot that nigger.

. . .



 It was on Memorial Day weekend. I said I was in Denton because it was the
Memorial Day weekend. That's where I told them I was. That's where I told the
laws I was.

. . .



 [W]ith that gun I got from Joe. Remember Joe came over and said we could have that
gun if we wanted it.


Prior to overhearing the conversation, Middleton did not know anything about the case nor, did he
know anyone named Mae Mae or Karston Watson. 

 Secondly, Foster testified he saw both Appellant and Johnson enter the home. The men
"walked to the door, knocked on it, went in and shot." Appellant contends Foster's testimony merely
places him at the scene but does not connect him to the offense. While we recognize an accused's
mere presence with an accomplice before, during, and after the commission of the offense is
insufficient by itself to corroborate accomplice testimony, evidence of presence when coupled with
other suspicious circumstances may tend to connect the accused to the offense. See Dowthitt v.
State, 931 S.W.2d 244, 249 (Tex.Crim.App. 1996). Both Middleton and Foster connected Appellant
to the offense. Consequently, the evidence was sufficient to comply with Article 38.14. Gill v.
State, 873 S.W.2d 45, 48 (Tex.Crim.App. 1994)(all that is required is that some non-accomplice
evidence tend to connect the accused and, there is no precise rule as to the amount of evidence
required to corroborate the testimony of an accomplice witness). We overrule Issue Three and affirm
the judgment of the trial court.


October 4, 2007 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.


(Do Not Publish)

1. Taylor's street name was "Man" and Watson's street name was "Trouble." 
2. The victim's name was Karston Watson not Karlton Watson.